# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4023 | **DATE** | 8/11/2003 |
| **CASE TITLE** | Depuy, Inc. vs. Zimmer Holdings, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/26/03 at 10:15 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order denying defendant's motion for summary judgment (61-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **6** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 1 2 2003 | |
| | Docketing to mail notices. | | date docketed | 96 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 8/11/2003 | |
| MPJ | courtroom deputy's initials | | date mailed notice | |
| | | | MPJ | |
| | | | mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

FILED FOR

03 AUG 11 PM 6:06

Date/time received in central Clerk's Office



AUG 1 2 2003

DEPUY, INC.,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )
                                      )   No.   02 C 4023
ZIMMER HOLDINGS, INC., and ZIMMER,    )
INC.,                                 )
                                      )
            Defendants.               )
                                      )

## MEMORANDUM OPINION AND ORDER

Plaintiff DePuy, Inc. ("DePuy") sued defendants Zimmer
Holdings, Inc. and Zimmer, Inc. (collectively "Zimmer") for patent
infringement.  DePuy alleges that Zimmer is infringing claims 11-13
of its patent entitled "Modular Hip Prosthesis" ("'706 Patent").
The determination of infringement is a two-step process.  First, I
construe the claims in the patent to determine their scope.  Then,
the allegedly infringing device is compared to the claims as
construed.  *Bell Atlantic Network Servs., Inc. v. Covad
Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).
Claim construction is an issue of law.  *Id.*

The relevant claims[1] in the '706 Patent are as follows:

1. A kit for the assembly of a modular bone joint prosthesis
for the replacement of a head, neck, and adjacent portions of
a bone, the kit comprising
      at least two stems, with each stem sized for insertion
            into a cavity of the bone,
      at least two bodies, with each body sized to replace a

_____

[1]  Although only infringement of claims 11-13 is alleged,
claims 11-13 are dependent on claim 1.

portion of the bone, and with each body configured
to be joined in fixed attachment to one of the at
least two stems,
at least two head members, with each head member sized
to replace a head portion of the bone, and
means for fixedly attaching one of the at least two head
members to one of the at least two bodies.
...
11. The Kit of claim 1, wherein one of the at least two stems
has a different size and shape as another of the at least two
stems.
12. The Kit of claim 1, wherein one of the at least two
bodies has a different size and shape as another of the at
least two bodies.
13. The Kit of claim 11, wherein one of the at least two
bodies has a different size and shape as another of the at
least two bodies.

(8:26-39, 9:8-16.)[2]  The meaning of several of these terms is
disputed by the parties.  First, the parties dispute whether "kit"
means simply a collection of parts, or whether it means a
collection of parts collected together in a common container.
Second, the parties dispute whether the references to "bone" in the
claims are limited to femurs and hip bones, and also whether the
reference to replacement of "adjacent portions of bone" refers only
to a small portion of the bone.  Third, the parties dispute whether
the "means for fixedly attaching" a head to a body requires use of
a separate neck piece.  Finally, the parties differ as to whether
the phrase "different size and shape" can even be interpreted, with
Zimmer moving for summary judgment on the ground that the claims
are invalid as indefinite under 35 U.S.C. § 112 ¶ 2.  I deny
Zimmer's motion for summary judgment and construe the relevant

---

[2]  Citations to the patent are in the form (Column:Lines).

2

claims as follows.

## I. "Kit"

The first step in claim construction is to look at the language of the claim itself. *Bell Atlantic*, 262 F.3d at 1267. Claim terms are given their ordinary and accustomed meaning as understood by one of ordinary skill in the art. *Id*. Dictionary definitions may be examined to determine a claim term's ordinary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Here, dictionary definitions support both parties' interpretations of the term "kit." For example, "kit" can be defined as "a set of parts to be assembled," which does not imply a container requirement, but it can also be defined as "a packaged collection of related material." Webster's Ninth New Collegiate Dictionary 663 (1991). Zimmer points to a dictionary defining "kit" as "a collection of equipment and often supplies typically carried in a box or bag." Webster's Third New International Dictionary 1246 (1986). While DePuy correctly notes that the term "typically" in that definition means that a box or bag is not required to turn a collection into a kit, it also implies that the ordinary and accustomed meaning--the way the term is typically used--includes a common container. Thus, reference to dictionary definitions here is inconclusive as to the ordinary meaning of the term "kit."

When there is more than one ordinary meaning for a claim term,

the patent specification serves to point away from improper meanings and toward the proper meaning. *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Here, the specification points to the basic definition of "kit" as "a set of parts to be assembled." For example, the specification describes the kit as consisting of stem members, body members and head members that are "separate components ... adapted to be assembled together to form a custom prosthesis." (3:8-13.) The specification repeatedly refers to the assembly of a prosthesis from the parts in the kit, but fails to mention a common container for the parts. Even when specifically describing the "kit concept" and the "kit form," the patent explains only that the benefits of such a concept or form include a reduction in the inventory required to be maintained by a hospital and increased flexibility by providing for assembly of a prosthesis that may otherwise be unavailable. (3:50-55.) There is no indication that the kit concept or kit form includes a common container. Because the term "kit" in the claim has more than one ordinary meaning, but the specification points only to the ordinary meaning of "a set of parts to be assembled," that is how I construe the claim. The parts are not required to be collected in a common container.

## II. "Bone"

Claim 1 uses the term "bone" several times. DePuy argues that the term should be construed to mean "hip bone" or "femur," while

4

Zimmer argues that the term should not be so limited and should include shoulder and arm bones. Thus, for example, DePuy argues that the claim, which calls for "[a] kit for the assembly of a modular bone joint prosthesis," should be read as a kit for the assembly of a hip joint prosthesis, and that references in the claim to pieces sized for insertion into or replacement of a portion of the bone should be read as pieces sized for insertion into or replacement of a portion of the patient's femur.

Clearly the ordinary and accustomed meaning of the term "bone" is not limited to hip bones and femurs. DePuy argues, however, that the specification leaves no doubt that the claimed invention is limited to hip replacements. Indeed, the patent is titled "Modular Hip Prosthesis," (1:2), and begins by reciting:

> The present invention relates to prosthesis for replacement of a portion of the hip joint. More particularly, the present invention relates to a modular prosthesis for replacement of the upper portion of the femur.

(1:13-16.) The specification goes on to describe the current state of conventional hip prostheses and some of the problems associated with them (1:17-60), and then explains that "[the] object of the present invention is to provide a modular hip prosthesis" that addresses these various problems (2:50-64). It is clear that the specification is describing a hip prosthesis in particular, as opposed to any ball-and-socket-type prosthesis in general. The claim construction inquiry, however, "begins and ends in all cases with the actual words of the claim." *Renishaw*, 158 F.3d at 1248.

5

And "while it is true that claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988).[3]

There is, however, a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification, *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998), and ultimately "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent," *Renishaw*, 158 F.3d at 1250. Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*. Here, that construction is one that reads "bone joint prosthesis" as "hip joint prosthesis," and the repeated references to "bone" as references to "the femur." The specification clearly indicates that the patentees meant "hip

---

[3] *Sjolund* goes on to explain the justification for this rule: If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment. Nor would a basis remain for the statutory necessity that an applicant conclude his specification with "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."
847 F.2d at 1582 (quoting 35 U.S.C. § 112).

6

joint prosthesis" and "femur" in the claim, and by looking to the specification for this purpose, I am not importing an extraneous limitation into the claim. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim ... [b]ut this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.").[4] *See also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1256-57 (Fed. Cir. 1989) (reading a patent claim as limited to having properties set out in the specification because the specification "makes clear that the inventors were working on the particular problem of an effective optical communication system not on general improvements in conventional optical fibers [and thus, to] read the claim in light of the specification indiscriminately to cover all types of optical fibers would be divorced from reality.") (citing *du Pont*).

Zimmer makes two arguments why the claims should not be limited to hip joint prostheses. First, in claim 18, which is not at issue here, the patent claims "[a] kit for the assembly of a *hip* prosthesis for replacement of a head, neck, and adjacent portions

---

[4] The court in *du Pont* defined "extraneous limitation" as "a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." 849 F.2d at 1433.

of a *femur*." (9:29-31) (emphasis added). Thus, argues Zimmer, when the patentees wished to limit a claim to hip prostheses, they explicitly did so. The doctrine of claim differentiation states:

> There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between the claims is significant.

*Comark Communications*, 156 F.3d at 1187. There is thus a presumption that the terms "bone joint prosthesis" and "bone" in claim 1 have a separate meaning and scope from the terms "hip prosthesis" and "femur" in claim 18. However, the doctrine of claim differentiation applies only if giving the terms in claim 1 the same meaning and scope as the terms in claim 18 renders one of the claims superfluous. That is not the case here. Claim 18 describes a kit containing stems with a lower portion and an upper portion and bodies that are placed over the upper portion of the stem. (9:29-41.) Claim 1, on the other hand, describes a kit containing stems and bodies "to be joined in fixed attachment." (8:27-35.) Claim 1 does not describe the stems as containing upper and lower portions and does not describe the bodies as being placed over the upper portion of the stem. Reading "bone joint prosthesis" and "bone" in claim 1 as having the same scope and meaning as "hip prosthesis" and "femur" in claim 18 does not render either claim superfluous, and the doctrine of claim differentiation therefore does not apply to require a broad reading of claim 1 as

8

including shoulder joint prostheses.

Zimmer also argues that the prosecution history indicates that the patentees did not intend to limit claim 1 to hip prostheses. *Cf. Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he court may [in the course of claim construction] consider the prosecution history of the patent, if in evidence."). Claim 1 of the '706 patent comes from claim 18 of the '706 patent application. (DePuy Ex. 3 at DPY018095-96.) Claim 18 of the '706 patent application came from claim 20 of patent application serial number 07/793,860. (DePuy Ex. 3 at DPY018099.) Patent application serial number 07/793,860 was originally entitled "Modular Humeral Prosthesis," and claim 20 of that application was described as "not being limited to a shoulder prosthesis." (Zimmer Ex. K.) Thus, argues Zimmer, the claim that ultimately became claim 1 of the '706 patent began as a claim broadly covering both shoulder and hip prostheses. All this history indicates, however, is that the language of claim 1 of the '706 patent is, on its face, broad enough to cover both shoulders and hips. The fact that the claim started out as a claim in a humeral prosthesis patent application does not mean that when the claim language was transferred to a patent describing only a hip prosthesis that it retained its coverage of shoulder prostheses. As discussed above, although the language of the claim could cover any ball-and-socket joint generally, reading the claim in light of the specification

indicates that as used in the '706 patent, claim 1 covers only hip prostheses.

A related dispute between the parties is whether, given that the prosthesis is limited to the hip joint and femur, the prosthesis is limited to use in only certain types of surgeries. DePuy argues that claim 1, which claims a prosthesis to replace a head, neck, "and adjacent portions of a bone" should be read as limiting the use of the prosthesis to surgeries in which only a small portion of the femur adjacent to the head and neck is removed. DePuy contrasts hip replacements typically used in arthritis cases, in which only a small portion of the femur is removed, with hip replacements typically used in oncological applications, in which a much larger portion of the femur is removed. Zimmer, on the other hand, argues that the claim language does not support a limitation to any particular kind of surgery or amount of femur removed.

The plain meaning of the term "adjacent portions" cannot seriously be disputed. "Adjacent" means "next to" and "portion" means "a part of a whole." Thus, claim 1 calls for a prosthesis for the replacement of a head, neck, and parts of the femur next to the head and neck. There is no explicit limitation in the claim as to the size of the portion of the femur to be replaced. Nor is there anything in the specification indicating such a limitation. DePuy points to two figures in the specification showing the device

replacing only a small portion of the femur, but it is well established that patent drawings may not be relied upon to show particular sizes if the specification is completely silent on the issue. *Hockerson-Halberstadt, Inc. v. Avia Group Int'l Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (rejecting an argument based on a patent drawing regarding the width of a groove in an athletic shoe heel). Thus, the fact that two drawings in the patent show only a small femur portion being replaced by the device in no way establishes a limitation on the size of the femur portion that can be replaced.

DePuy also points to the patent history to support its argument that there exists a limitation on the size of the femur portion that can be replaced. As part of the application process, the patentees submitted an information disclosure statement discussing prior art. (DePuy Ex. 2 at DPY019130-36.) In the disclosure statement, the patentees described prior art in which "[t]he prosthesis ... is designed to replace the entire upper portion of the femur, and not to be implanted within the femur." (*Id.* at DPY019133.) DePuy argues that this statement distinguished the prostheses claimed in the '706 patent from prior art prostheses that replaced large portions of the femur, and thus limited the '706 patent claims to prostheses replacing only small portions of the femur. Statements made in an information disclosure statement can be used to interpret the scope of patent claims. *Ekchian v.*

*Home Depot, Inc.*, 104 F.3d 1299, 1303-04 (Fed. Cir. 1997). However, "[u]nless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage." *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996). Here, the disclosure statement simply described prior art in which the prosthesis replaces the entire upper portion of the femur and contrasts that to simply implanting the prosthesis within the femur. It does not "clearly disavow[]" claim coverage over prostheses otherwise covered that replace the entire upper portion of the femur.

DePuy points to one other element of the prosecution history to support its argument that there exists a limitation in the claim on the size of the femur portion that may be replaced by the prosthesis. The claim was at one time rejected as clearly anticipated by another patent ("Harder"). In requesting reconsideration of the rejection, the patentees distinguished Harder by arguing, among other things, that unlike the prior patent, the current claim "require[s] selection of a stem from different sized and shaped stems and having a portion for reception into the femur." This language pointed to by DePuy says nothing about how large a portion of the femur may be replaced by the claimed prosthesis and therefore does not "clearly disavow[]" claim coverage over prostheses otherwise covered that replace large

12

portions of the femur. Thus, neither the specification nor the prosecution history presents any reason to limit to small portions of the femur the plain language of the claim covering replacement of "adjacent portions of a bone."

### III. "Means for Fixedly Attaching"

Claim 1 claims the "means for fixedly attaching one of the at least two head members to one of the at least two bodies." (8:38-39.) A patent may claim a means for performing a specified function without expressly claiming a structure for performing that function. 35 U.S.C. § 112 ¶ 6. *See also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998) ("A means-plus-function limitation contemplated by 35 U.S.C. § 112, ¶ 6 recites a function to be performed rather than definite structure or materials for performing that function."). In such a case, the claim shall be construed to cover the structure described in the specification for performing the claimed function and any equivalent structures. *Id.*

Before analyzing what appears to be a section 112 paragraph 6 means-plus-function limitation of a claim, I must assure myself that such a limitation is at issue. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000). The fact that both parties agree that the "means for fixedly attaching" element of claim 1 is a means-plus-function limitation does not relieve me of the responsibility to determine for myself that the element

invokes section 112 paragraph 6.  *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).[5]  In determining whether a claim element is a means-plus-function limitation, I apply a presumption that patentees using the word "means" intended to invoke section 112 paragraph 6.  *Id.* at 1302.  This presumption is overcome in two instances.  First, a claim that uses the word "means" but does not state any corresponding function is not a means-plus-function limitation.  Second, a claim that uses the word "means" and states a corresponding function, but goes on to recite sufficient structure or material for performing that function is also not a means-plus-function limitation.  *Id.* Here, the "means for fixedly attaching [a head member to a body member]" element invokes the term "means," states a corresponding function--"for fixedly attaching [a head member to a body member]," and does not go on to recite any structure for doing so.  (8:38-39.)  This claim element is therefore a means-plus-function limitation invoking section 112 paragraph 6.  *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375-76 (Fed. Cir. 2003) (reading "means of booting said digital computer" as a means-plus-function limitation).

Having determined that a means-plus-function limitation is at

_____

[5]  *But see Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001) (failing to inquire into whether claim elements were mean-plus-function limitations, finding no reason to depart from the parties' and district court's consistent position that they were means-plus-function limitations, despite potential reason for doing so).

issue, I must now construe the function recited in the claim, and determine what structures have been disclosed in the specification that correspond to the means for performing that function. *Kemco Sales*, 208 F.3d at 1361. The function recited in the claim is straightforward and not disputed by the parties. It is simply to fixedly attach a head member to a body member. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("[Section 112 paragraph 6] does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim."). The nature of the corresponding structure disclosed in the specification, however, is an issue disputed by the parties.

DePuy argues that the corresponding structure is a neck that connects the head to the body, and that the neck may be integral with the body, integral with the head, or separate from and attachable to both. Zimmer, on the other hand, argues that the neck connecting the head and body must be an individual piece separate from both the head and body. A means-plus-function limitation covers all structures disclosed in the specification that correspond to the claimed function. *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000). One corresponding structure disclosed in the specification is a neck piece that is separate from the head and body. Figure 7 of the '706 patent shows a separate neck piece containing a threaded end and a tapered end.

15

The threaded end is secured to the body, while the tapered end receives the head. (7:13-21.) Figure 7c shows a slight variation on the separate neck in figure 7, in which the neck is attached to both the head and body through tapered ends, as opposed to one tapered end, one threaded end. (7:43-48.) Another disclosed structure is a neck piece that is integral with the head. Figure 1 shows a neck member that is attached to the body by a threaded end but has the head already formed on the other end. (5:10-17.) The head is attached to the body by simply screwing the head/neck piece into the body and tightening with a wrench. (5:21-33.) The specification thus clearly discloses two structures for fixedly attaching a head to a body: a neck piece separate from both the head and body, and a neck piece separate from the body but integral with the head.[6]

DePuy argues that the patent discloses an additional structure, namely a neck piece separate from the head but integral with the body. The patent describes prior art that disclosed a prosthesis composed of "an anchoring part," "a transition part," and a ball. (2:29-49.) The anchoring part is inserted in the femur, the transition part is coupled to the anchoring part, and

---

[6] These disclosed structures also include various options for collars and clips that may be inserted between the neck and body. See, e.g., (7:24-28) ("A collar clip is shown that inserts under the projection of the collar to lock the neck member in position after it has been screwed into the threaded hole in the body member.") (drawing numbers omitted). These parts of the structure are not at issue here.

the ball is screwed onto the transition part. The patent indicates that in this prior art, then, "the neck is a part of the transition part." (2:45.) DePuy argues that this description of the prior art discloses a structure in which the neck is integral with the body.

A specification's description of prior art may sufficiently disclose a structure corresponding to a claimed function in a means-plus-function limitation. *See Clearstream Wastewater Sys. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1445-46 (Fed. Cir. 2000). The fact that the disclosed structure is prior art and not novel does not imply that it may not be a corresponding structure. *See id.* However, the specification must "clearly link[] or associate[]" the disclosed structure to the function recited in the claim in order for the structure to correspond to a claimed function in a means-plus-function limtation. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). This duty to clearly link or associate structure to function is the *quid pro quo* for the convenience of employing a section 112 paragraph 6 means-plus-function limitation. *Id.* Here, the function recited in the claim is the attachment of a head member to a body member. The prior art structure described in the patent, however, does not contain a body member. It contains an anchoring part and a transition part, but nothing called a body. DePuy asserts that what the prior art calls a transition part is the same thing as a body. Whether or not that

is true, the patent's discussion of the prior art does not clearly link or associate the structure described by the prior art (in which the neck is integral with the transition part) to the function of attaching a head member to a body member. *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1312 (Fed. Cir. 2001) (holding that even if a disclosed structure is definitely capable of performing the recited function, absent a clear link or association under *Braun*, the structure is not claimed as a corresponding means). Thus, the prior art structure described is not a structure corresponding to the means-plus-function limitation. The specification discloses only two types of structures for fixedly attaching a head to a body, one in which a neck piece is separate from both the head and body, and another in which the neck piece is separate from the body but integral with the head.[7]

## IV. "Different Size and Shape"

Claim 11 claims the kit of claim 1 wherein one of the stems "has a different size and shape" as another of the stems (9:8-10), claim 12 claims the kit of claim 1 wherein one of the bodies "has

---

[7] The fact that I do not find any corresponding structure in the patent in which the neck piece is integral with the body piece does not necessarily mean that such a structure cannot be *equivalent* to the structures I find corresponding to the recited function. A means-plus-function limitation claims corresponding structures described in the specification "and equivalents thereof." 35 U.S.C. § 112 ¶ 6. Section 112 paragraph 6 equivalency is a question of fact. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268-69 (Fed. Cir. 1999).

a different size and shape" of another of the bodies (9:11-13), and claim 13 claims the kit of claim 11 wherein one of the bodies "has a different size and shape" of another of the bodies (9:14-16). DePuy argues that the terms "size" and "shape" should simply be given their ordinary and accustomed meanings. Zimmer, on the other hand, argues that "different shape" is indefinite under 35 U.S.C. § 112 ¶ 2, rendering claims 11-13 invalid, and moves for summary judgment accordingly.

35 U.S.C. § 112 ¶ 2 states that patent claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." The standard for determining whether a patent claim is sufficiently definite to satisfy this statutory requirement is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). In other words, the standard is "whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing." *Id.* (internal quotation omitted). Determination of claim indefiniteness is a question of law drawn from my duty as construer of patent claims. *Id.* at 1376.

While DePuy asks me to look at the terms "size" and "shape," and Zimmer asks me to examine the meaning of "different shape," the only way to proceed is to determine whether, in their entirety, the

claims containing the "different size and shape" language can be construed. If a claim is insolubly ambiguous such that no narrowing construction can properly be adopted, the claim is statutorily indefinite. *Id.* at 1375. If, however, the meaning of a claim is discernible, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the claim is sufficiently clear to avoid invalidity on indefiniteness grounds. *Id.*

The phrase "different size and shape" is susceptible to two distinct meanings. The first reads "different size and shape" as meaning "different size and different shape," and thus objects that are the same shape but different sizes or objects that are the same size but different shapes are not of "different size and shape." The other way to read the phrase "different size and shape" is to read it as meaning "not the same size and shape," that is, as the opposite of "same size and shape." Under this reading, if two objects do not have both the same size and the same shape as one another, they are of "different size and shape." Reading the specification, it becomes clear that this second reading is the proper interpretation of the claim. The specification indicates that the purpose of a kit containing components of various shapes and sizes is to provide a wide variety of options in creating a prosthesis to fit an individual patient. (3:46-50.) This purpose is satisfied so long as each of the various types of components are

not identical to one another. For example, a kit containing two heads of the same size and shape, two bodies of the same size and shape, and two stems of the same size and shape would not provide the flexibility described in the specification. It is immaterial, however, whether the two heads, two bodies, and two stems have only different sizes, only different shapes, or both. If the kit contained, for example, two different shaped bodies of roughly the same size, the described flexibility would still be present. Likewise, if the kit contained two bodies of the same shape in two different sizes, the described flexibility would be present. Thus, the specification points toward the proper interpretation of "different size and shape" as meaning "not the same size and shape." Further, because the proper meaning of "different size and shape" has thus been discerned, the claims are not invalid on indefiniteness grounds. *See Exxon Research & Eng'g Co.*, 265 F.3d at 1375.

### V. Conclusion

The disputed claim terms are construed as discussed above. The kit does not require a common container, the prosthesis is limited to replacements of hip joints, there is no limitation on the size of the portion of femur to be replaced by the prosthesis, the disclosed structures corresponding to the means for fixedly attaching a head to a body include a neck piece separate from the head and the body and a neck piece separate from the body but

21

integral with the head, and the term "different size and shape" requires only that there are two of each type of piece that do not have the same size and shape. Further, because the claims are not invalid as indefinite, defendant's motion for summary judgment is DENIED.

ENTER ORDER:

_Elaine E. Bucklo_
Elaine E. Bucklo
United States District Judge

Dated:    August 11, 2003